## WEISS v. BETHLEHEM IRON CO.

(Circuit Court of Appeals, Third Circuit. June 13, 1898.)

### No. 7.

1. TRIAL—MISLEADING INSTRUCTIONS.

Instructions which, taken as a whole, are calculated to mislead the jury as to the character of the evidence necessary to prove the issue on one side, are erroneous.

2. SAME—FAILURE TO SUBMIT MATERIAL EVIDENCE.

Reversible error exists if the general effect of a charge tends to withdraw from the consideration of the jury material evidence, or fails to present with sufficient distinctness a material fact which may have a controlling effect.

3. SAME.

It is error for the court to submit the evidence and theory of one party prominently and fully to the jury, and not call their attention to the main points of the opposite party's case.

4. MASTER AND SERVANT—PRIVATE RAILWAY—EMPLOYE CROSSING TRACK.

The rule requiring a traveler on a highway to stop, look, and listen before crossing a railroad track, is not the criterion by which to determine the degree of care required by an employé about to cross a private railway operated as part of his employer's rolling-mill plant. In such case the employer is bound not to expose its servant, conducting its business, to unnecessary peril against which it might have guarded with reasonable diligence; and the servant has a right to assume that his employer will not subject him to needless danger. The servant is therefore bound only to observe reasonable care to avoid danger which is obvious, or which is known to him, or of which he might have acquired knowledge by the exercise of proper attention.

Dallas, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Geo. Demming and M. Hampton Todd, for plaintiff in error.
John G. Johnson, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BRADFORD, District Judge.

ACHESON, Circuit Judge. This is an action brought by John Weiss against the Bethlehem Iron Company to recover damages for bodily injuries alleged to have been sustained by the plaintiff by reason of the negligence of the defendant. The plaintiff went into the employment of the defendant company at its steel works on the evening of April 27, 1896. He worked at night from 6 o'clock in the evening to 6 o'clock in the morning, and his duties were to wheel fire brick and clay in a wheel barrow to a place in the defendant's mill, where new furnaces were in course of erection, and to wheel therefrom old fire brick, and dump them at a refuse pile in the defendant's adjoining mold yard. While engaged in this latter work, shortly after 9 o'clock on the night of April 30, 1896,—the fourth night of his employment,—the plaintiff was struck by a moving car which crossed his pathway, and was badly maimed, under the circumstances and in the manner about to be related. In wheeling away the old fire brick in his barrow, the plaintiff pursued, as he was directed to do, a wheelbarrow runway which passed through an opening in the wall of the mill out into the mold yard, and proceeded through the yard to a right angle of the wall of the mill, and thence, turning to the left on a line parallel with the wall, and a few feet distant therefrom, to the refuse pile. The last-mentioned part of this wheelbarrow runway at one point crossed a narrow-gauge railway track, 2½ feet wide, upon which ran a "dinkey engine" and its "buggies" (a small locomotive and small cars), used in transporting molds from and into the mill. In coming out of the mill into the mold yard, this dinkey engine and its cars emerged through a doorway in the wall, which doorway was 11 feet, less 4 inches, wide. The distance from the outside of the wall to the middle of the wheelbarrow runway crossing was 7 feet. Immediately inside the doorway, within the mill, the railway track made a sharp curve, so that a person standing in the middle of the wheelbarrow crossing and looking into the mill through the doorway could see along the railway track only the distance of 19½ feet. Therefore, if the head of the engine were on the track inside the doorway, and 12½ feet distant therefrom, it would be invisible to a person at the wheelbarrow crossing under all circumstances. The dinkey engine was 19 feet long, and the length of one of its buggies or cars was 11½ feet. In coming out of the mill through the doorway, the engine sometimes pulled a car, and sometimes pushed a car ahead. Its ordinary rate of speed was from four to six miles an hour. Its usual signal before it emerged outside was its whistle, sounded a short distance—about 25 feet—inside the mill as it came around the curve already mentioned towards the doorway. Usually, however, there were three dinkey engines in constant use in the mill at the same time, moving upon several narrow-gauge railway tracks laid in various directions through the mill; and these three engines, it was testified, were giving signal whistles every few minutes all day and all night. A disinterested witness (Julien), speaking of these moving dinkey engines, said: "They always whistle; they are always going; never stop." It also appeared that there were several stationary engines in the mill near this locomotive doorway, whose whistles were sounding from time to time, and that

other loud noises at that place were constantly made by the Bessemer blowers and otherwise. The plaintiff was 31 years of age. He was a German, who had only been in this country a few months before he went into the defendant's service. He had not previously worked in such an establishment, and had never been in the defendant's works before his hiring.

There was evidence tending to show that it was a rule at the defendant's works for the foreman to warn new men in regard to the danger from locomotives, but that no such warning was given to the plaintiff. The defendant's general foreman, Charles G. Barnes, who hired the plaintiff, testified: "As a rule, I generally caution the men about the tracks to be crossed, and the locomotive coming out on the tracks; but I don't know whether I told him [plaintiff] or not. I know I told the foreman of the bottom makers to tell him about it; to take him out and show him the tracks." It was not shown that any one had given such caution to the plaintiff. To the contrary, speaking of the dinkey engine which came out of the doorway into the mold yard and crossed the wheelbarrow runway, the plaintiff testified, "No one told me anything about that locomotive." The plaintiff testified that during each of the three nights he had worked before the night on which he was hurt he had wheeled six loads of old fire brick to the refuse pile, and, counting both his goings and returns, had thus crossed the railway track 12 times each of these three nights. He had wheeled, it seems, three loads on the fourth night before the trip on which the accident occurred. Thus, as he stated, he had crossed the track with his wheelbarrow altogether 42 times, computing both his going and returning. The plaintiff testified that only on one occasion had he seen the locomotive come out of the doorway into the mold yard, and this on the first or second night of his service; and that on that occasion a man came to the doorway, looked out, and beckoned with his hand for the engine to come on, and that this man came out, and the engine followed him. No part of this testimony was contradicted. In one particular it was corroborated, as we shall more fully see hereafter.

On the occasion when the plaintiff was run down, the locomotive, it would seem, was moving at its usual speed, and blew its usual signal whistle inside the mill at the customary place, but no other precaution was observed. The engine was pushing a car ahead. The car was loaded with molds, which, it was testified, would show a "cherry red" in the dark. There was no light on the car, nor was any person on it. The engineer, speaking of the plaintiff, testified, "I couldn't see him; there were molds on the top of the buggy." Presumably, then, the plaintiff could not see the engineer or the head of the engine. In the mold yard there was an electric arc light perhaps 150 feet from the crossing. As to the effectiveness of this light at the place of the accident there was some conflict of evidence.

With reference to the accident the plaintiff testified in substance as follows: That as he approached near to the railway track, and before starting to cross it, he listened and looked, and he heard nothing and saw nothing; that he then went straight ahead, without stopping, and shoved his wheelbarrow over the track; that he himself had

reached the middle of the railway track when he was struck by the car, and dragged by it seven or eight yards. In response to the question asked by the court, "Why did you do that [listen and look] if you had never seen an engine pass along that track but once in all your experience?" the plaintiff answered: "I looked and listened, and when that man came out before to see whether everything was right —that was the reason I looked and listened. I looked for the man to come." The plaintiff stated that while he was upon this trip, and after he had started from the mill, he heard the whistle of a locomotive inside, but, that the locomotives were constantly whistling inside the mill as he passed along the wheelbarrow runway.

The counsel for the defendant insist "that as a matter of law the plaintiff, upon the evidence in this case, cannot recover." But this proposition is wholly inadmissible. The supreme court of the United States has declared that it is only when the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the court. Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679; Railway Co. v. Gentry, 163 U. S. 353, 365, 368, 16 Sup. Ct. 1104. And the court there made observations which we do well to bear in mind here:

"What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions of the court. It is their province to note the special circumstances and surroundings of such particular case, and then to say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs."

As was said in Railway Co. v. Gentry, supra, so we say of the present case that it was "one peculiarly for the jury under appropriate instructions as to the principles of law by which they were to be guided in reaching a conclusion." The evidence, we think, fairly justified a finding that the crossing at which the plaintiff was injured was a place of special danger. As we have seen, the wheelbarrow runway crossed the railway track in front of and only seven feet from a comparatively narrow doorway out of which a dinkey engine and its cars emerged. A sharp curvature of the railway track inside the doorway prevented a sight of an approaching locomotive or car until it was within 20 feet of the crossing. It was no unusual thing—as happened in the instance under investigation—for the engine to push ahead a car without outlook or light upon it. The only signal of approach usually given— and the one given on this occasion—was a whistle from the locomotive while it was inside the mill, and not visible from the crossing. There was evidence tending to show that the defendant's superintendent and foreman regarded this crossing as particularly dangerous, and that the habit was to warn new and inexperienced employés against this danger. The plaintiff testified that no such warning was given to him, and in this statement he was thoroughly corroborated. Under the evidence a finding that he was so cautioned could not have been sustained. The plaintiff was entirely inexperienced when he entered the defendant's service. This was known to the defendant's foreman when the plaintiff was hired. The plaintiff worked at night. He was in-

jured in the early part of the fourth night of his service.    He testified that only once had he seen the locomotive come out through this doorway, and that then a man came before, apparently to give warning of its approach.

Whether, with respect to evidence tending to establish the recited state of facts, the instructions which the court gave to the jury were appropriate and adequate, let us now consider.    The court substantially affirmed the plaintiff's fourth point, which was to the effect that, if the jury found that the plaintiff had received no special instructions in regard to the mode in which the engine came out of the doorway, and his personal observation justly led him to believe that every time it came out some one preceded it to warn him and his fellow workmen off the track, and the plaintiff had no other reasonable way of better informing himself, the jury should find that the defendant failed in its duty to give him instructions; but, after so charging the court, immediately added:

"The plaintiff, in presenting his case through his counsel, has laid a good deal of stress on the position stated in the point just read to you, and if you render a verdict for him it is not at all improbable that it will be based upon this point.    I therefore call your attention to the fact that the only evidence that the plaintiff had any justification for supposing the engine when it approached the crossing was preceded by a man to give warning is to be found in his own testimony, which is to the effect that upon the only occasion when he saw an engine come out of the doorway and approach the crossing it was preceded by such an individual.    So that the fact upon which this point is predicated is testified to by the plaintiff alone.    Now, if the case is put upon that point, you must bear in mind that the point is predicated and supported by the testimony of the plaintiff alone.    That may be sufficient, if it satisfies your mind fully, in view of the other evidence, it is.    But you must not overlook the fact that this is the testimony of the plaintiff; that he is interested to the extent of all involved here, and must remember that other witnesses who have been called, who are disinterested, and who spoke upon this subject, said that it was not the practice so to warn persons of the approach of an engine to that crossing; that they never knew it to be done in all their experience; that the method of giving such warning was by means of a whistle, and no other.    It is for you to say whether this occurred as the plaintiff has testified, or whether he was mistaken respecting it."

The proposition embodied in the plaintiff's fourth point had a most important relation to the case.    The court, indeed, went so far as to say to the jury that, if they rendered a verdict for the plaintiff, "it is not at all improbable that it will be based upon this point."    It was, therefore, a matter of great moment to the plaintiff that the instructions of the court should be accurate.    The plaintiff's statement as to what he saw on the first or second night of his service in respect to a man preceding the locomotive as it issued through the doorway was circumstantial.    It was either a truthful statement or a fabrication. If true, it was a great fact in the case, to which the jury should have given the most serious consideration in connection with the evidence bearing upon the defendant's alleged neglect of duty to the plaintiff in failing to give him warning against a danger which was not obvious. As we have seen, the court said that "the point is predicated and supported by the testimony of the plaintiff alone," and that he was "interested to the extent of all involved here," and that other witnesses "who are disinterested," and who had spoken upon this subject, said "that it

was not the practice so to warn persons of the approach of the engine to that crossing; that they never knew it to be done in all their experience; that the method of giving such warning was by means of a whistle, and no other." Evidently these instructions were calculated to discredit the plaintiff with the jury. Now, in so charging the learned judge had overlooked the testimony of the brakeman (Julien), who, upon cross-examination by the defendant's counsel, had testified thus:

"Q. Had you ever known anybody to run ahead of the locomotive? A. When they are in there loading molds off the front of the foundry, the brakeman always walks out there. Q. Repeat that again. A. I say when there is molds come out of the foundry, and get put off at the other crane, the engine lays there at the dump empty, and the brakeman runs ahead."

This testimony, we think, tended to corroborate the plaintiff in his statement as to what he had observed. In view of this evidence, there certainly was error in the above instructions. Moreover, the erroneous statements of the court upon this subject were extremely hurtful to the plaintiff, and perhaps fatal to his case. The bill of exceptions, indeed, shows that in a supplemental charge to the jury the court, among other things, said:

"And you have been sent for to be informed that the plaintiff's counsel has called the attention of the court to a few lines of testimony of the witness Julien, called by him, which he desires you to hear read. I told you that I did not see any testimony corroborative of the plaintiff's statement that the only time he saw the engine leave the building and cross the track it was preceded by a man to ascertain whether the track was clear. The plaintiff's counsel thinks there is such corroboration in the lines which he will now read to you. [The lines were then read.] After reading, the court said, this testimony had not impressed it as it had the counsel, but that its effect and value was for the jury, to whom it was submitted."

Was this a sufficient correction of the error into which the court had fallen? We are constrained to answer negatively. The plaintiff was justly entitled to an unequivocal withdrawal of the previous erroneous statements of the court. The jury may well have understood that no retraction whatever was intended, but that the court adhered to the views it had previously expressed.

We now turn to the charge of the court upon the subject of the defendant's alleged negligence. Here it will be necessary for us to quote the major part of the instructions. We give all that are here material. The court said:

"In the case before us the plaintiff charges that the place where he was put to work was dangerous, and unnecessarily so. The only cause of danger pointed out which we are called upon to consider is that arising from the railroad crossing where he was injured. If any other cause of danger existed, it is not important, because it did not contribute to the injury. The precaution taken by the defendants to guard against danger at this crossing was the sounding of a whistle as the engine approached as notice of the approach. This is the usual signal adopted for such purpose. Unless, therefore, the circumstances existing at this crossing were such as to render this method of giving warning insufficient, you should find the defendants not to have been careless in this respect. I repeat: Unless the circumstances existing at this crossing were such as to render this method of signaling by whistling insufficient, you cannot properly find the defendants to have been careless in this respect. What else or more was it reasonable to expect or require of the defendants? You have heard the evidence on the subject,—a description

of the situation and surrounding circumstances; you have heard the discussion of it by counsel on one side and on the other, and I will not dwell upon the question. Were the circumstances at this crossing such as to require any other signal than that established by the rules of the company? Was it insufficient? Does the evidence show it to have been insufficient? It is the usual signal, and, so far as appears, the universal signal at railroad crossings generally. Was there anything here to require a different signal, or an additional signal. To the court it seems that the sounding of the whistle was sufficient to render the crossing reasonably safe, with the exercise of proper care by the plaintiff, with knowledge on his part of the situation. The case, however, is submitted to you, and you have the responsibility of deciding it. Had the plaintiff knowledge of the situation, or was the defendant remiss in failing to impart such knowledge to him? You have heard the testimony on that subject,—his own and that of defendant's witnesses. He had been repeatedly over the route, back and forth, on which he worked. He had seen the railroad, and the engine and cars upon it, upon one occasion at least. Would or not his eyes of themselves inform him fully in respect to the situation? * * * With these observations, and in view of the very thorough discussion of the subject by counsel, I submit to you the question, were the defendants guilty of negligence in the respects stated as complained of; that is, in not providing for safety at that crossing, or by withholding, or failing to give proper information respecting the method of operating the cars upon the road at that point? I feel it to be my duty to say to you that I do not think the evidence justifies a conclusion that the defendants failed in their duty in this particular. I do not take the question from you. I submit it to you. The responsibility will be upon you of deciding it justly. But you ought not to reach a conclusion on the subject without exercise of great care and the best judgment you possess. You cannot undertake to say how an establishment like this shall be constructed, how its railroad shall be located, what will answer its purposes, and what will not. You have not the information necessary to enable you to form a reliable judgment. The real question here in this respect is whether or not proper warning was given to this man at that crossing, or whether he was misled respecting it for want of proper information. These are the questions, and the only questions, that the court sees, as respects this branch of the case; and I repeat what I have said, that in the judgment of the court the evidence on one side and the other, properly considered, does not justify a conclusion that the defendant omitted or failed in any part of its duty in this matter. I repeat, however, so that you will not misunderstand me, that the question is one of fact, which is submitted to you."

Touching these instructions, our first observation is that no reference is here made by the court to the highly important evidence tending to show that this crossing was considered by the defendant itself a place of peculiar danger, and that it was customary to give particular warning of that danger to new and inexperienced workmen. We find no allusion whatever to this evidence in any part of the charge. This omission is the more to be regretted because the proof was that the plaintiff had not been warned. Again, the attention of the jury was not here directed to the fact that the plaintiff was a new and inexperienced hand, whose term of service had been very brief, extending only into the fourth night. Indeed, the charge assumed that the plaintiff had acquired full knowledge by observation. Furthermore, the court made no mention in detail of the unusual facts relating to the crossing and the manner of its use, which we have recited. Yet, without close attention to the special circumstances, the jury could not rightly determine whether the defendant had acted with due prudence, and with reasonable regard to the

safety of the plaintiff. In all these particulars we are obliged to say that the instructions of the court were incomplete and inadequate.

Then, again, the court, in effect, charged the jury that the defendant had performed its whole duty when it sounded a whistle in approaching the crossing, although the uncontradicted proof was that such signal was given when the locomotive was invisible to one approaching the crossing, and was given inside the mill, where other locomotives were continually giving like signals. In view of the exceptional facts, the instructions upon this point, we think, were too favorable to the defendant.

Still further, the court said: "You cannot undertake to say how an establishment like this shall be constructed, how its railroad shall be located, what will answer its purposes, and what will not. You have not the information necessary for you to form a reliable judgment." This instruction, it seems to us, was calculated to mislead the jury. It might not have misled a trained lawyer, but its effect on a jury might well be to unduly restrict legitimate inquiry. As we have already said, the determination of the facts of this case was peculiarly for the jury, and it was their province to consider all the circumstances and surroundings.

Instructions which, taken as a whole, are calculated to mislead the jury as to the character of the evidence necessary to prove the issue on one side, are erroneous. Rea v. Missouri, 17 Wall. 532, 543. Reversible error exists if the general effect of a charge tends to withdraw from the consideration of the jury material evidence. Hall v. Weare, 92 U. S. 728. If an instruction fails to present with sufficient distinction a material fact which may have a controlling effect, there is ground for reversal. Ayres v. Watson, 113 U. S. 594, 609, 5 Sup. Ct. 641. It is error for the court to submit the evidence and theory of one party prominently and fully to the jury and not call their attention to the main points of the opposite party's case. Canal Co. v. Harris, 101 Pa. St. 80; Reichenbach v. Ruddach, 127 Pa. St. 564, 595, 18 Atl. 432; Young v. Merkel, 163 Pa. St. 513, 520, 30 Atl. 196.

Upon the subject of alleged contributory negligence on the part of the plaintiff the court charged the jury as follows:

"Aside altogether from the questions whether the defendant was guilty of fault or negligence, could the plaintiff, by the exercise of such care as a man should exercise under such circumstances where there is danger, by the exercise of such care have seen or heard the engine? One of the witnesses called, who appears to be entirely disinterested,—though you will say how much confidence should be reposed in his testimony,—says that he saw the plaintiff approach the railroad on this occasion, saying that he saw him back some distance from the track, describing the situation.. He says he heard the whistle of the engine, and knew that it was coming; that he watched the man come steadily on, apparently without looking, and certainly without stopping, passed directly on the track in front of the engine, and was struck. Now, is that so? If it is, there can be no question about his negligence. In a situation like that it was his duty to be on his guard. There is nothing in the case that excuses him from the exercise of proper care. If he did pass steadily on from the point where this witness saw him, as the witness says he did, without taking any precaution to guard himself against the danger of coming into collision with the engine, there cannot, in the judgment of the court, be any room for doubt that he was guilty of contributory negli-

gence. He says that he stopped and looked and listened. It is for you to say whether that is the case. The witness to whom I refer says that he did not, and he is apparently disinterested. * * *"

We here note, first, that the court made an inadvertent mistake in saying that the plaintiff had testified that he had stopped before crossing the railway track. The plaintiff did not so testify, but stated the reverse. In consequence of this misapprehension, the court submitted to the jury a question of veracity as between the plaintiff and the witness Jacoby. No such issue, however, could be raised properly, for the supposed discrepancy in the testimony of the plaintiff and that of the other witness did not exist. But, aside altogether from this inaccurate statement, we are not able to concur in the views of the court upon the question of the plaintiff's alleged contributory negligence in not stopping before he attempted to cross the railway track. In substance and effect the court charged the jury that, if the plaintiff did not stop, he was guilty of contributory negligence. Now, the "stop, look, and listen" rule regulating the conduct of a traveler upon a highway when about to cross a railroad track is not the criterion by which to determine the degree of care which was incumbent upon the plaintiff. The difference between an ordinary railroad traversed by trains running at high rates of speed and the defendant's private railway in structure, equipment, location, and use is so great that the general rule governing the crossing of the former is not applicable to the latter. Again, the relation between the plaintiff and the defendant was very different from that which exists between a railroad company and a traveler upon a highway crossing the railroad. The defendant set the plaintiff to work upon its wheelbarrow runway, which crossed its railway track, and the plaintiff, in the performance of his work, necessarily crossed the railway, not upon the implied invitation of the defendant simply, but by its direction. The defendant was under a legal obligation not to expose its servant, when conducting its business, to unnecessary peril against which he might have been guarded by reasonable diligence on the part of the defendant. Hough v. Railway Co., 100 U. S. 213, 217. The plaintiff had a right to assume that the defendant would not subject him to needless danger, and hence his watchfulness would naturally be diminished. The plaintiff was bound only to observe reasonable care to avoid danger which was obvious, or which was known to him, or of which he might have acquired knowledge by the exercise of proper attention. Whether the plaintiff was guilty of contributory negligence was a question for the determination of the jury upon a consideration of the peculiar circumstances surrounding the case and in the light of all the evidence.

We find support for these views in the opinion of the supreme court of the United States in the recent case of Warner v. Railroad Co., 168 U. S. 339, 347, 18 Sup. Ct. 68, where it was held that the rule requiring a traveler upon a highway in crossing a railroad to stop and use his eyes and ears to ascertain whether a train is approaching did not apply to a person who was crossing a track at a station to get on a train. The court said that the person so cross-

ing the railroad did so upon the implied invitation of the railroad company, and that, while such implied invitation would not absolve him from the duty to exercise care and caution in avoiding danger, "nevertheless it certainly would justify him in assuming that, in holding out the invitation to board the train, the corporation had not so arranged its business as to expose him to the hazard of danger to life and limb unless he exercised the very highest degree of care and caution." The court added that the railroad company, in giving the invitation, must be presumed to have taken into view the state of mind and of conduct which would be engendered by the invitation; and the court held that it was a question for the jury, under all the circumstances, whether the plaintiff's intestate was chargeable with contributory negligence.

The judgment is reversed, and the cause is remanded to the circuit court with direction to set aside the verdict and grant a new trial.

DALLAS, Circuit Judge, dissents.

BRADFORD, District Judge (concurring). I fully concur in the conclusion reached by the presiding judge that the judgment below be reversed, the verdict set aside and a new trial granted. There is, however, one feature of the case not particularly dealt with in his opinion, which has impressed me with great force, and, as much as any other consideration, has convinced me that there was reversible error in the charge delivered to the jury in the court below. There was no evidence showing or tending to show that the defendant had, at or prior to the time the plaintiff was injured, either adopted or promulgated any rule requiring any person, at the time when a locomotive, with or without cars attached to it, was about to emerge from the defendant's mill and cross the wheelbarrow runway where the plaintiff was injured, to be stationed at the doorway or to precede the locomotive or cars in order to give warning to such persons as might be engaged in wheeling brick or other material along the runway path. The evidence does not disclose any such practice in relation to this subject as to permit a legitimate inference that such a rule existed; and the witnesses Tomaney and Julien testified that there was no such rule. Nor was there any evidence showing or tending to show the existence of any rule requiring a locomotive or car, about to pass from the mill and cross the runway, to stop at the doorway before proceeding further. The runway, together with other paths in the mould yard, was maintained by the defendant for the use of its operatives in performing the work for which they were employed. The doorway through which the car passed and struck the plaintiff was ten feet and eight inches wide in the clear. From the plane of the outside of the wall, where the doorway was situated, to a point in the middle of the runway as it crossed the narrow gauge railway track, was a distance of seven feet and one inch. The evidence shows that the rate of speed of locomotives emerging from the doorway and crossing the runway was from four to six miles an hour. If the speed of a locomotive or car coming out of the doorway be taken at

an average of five miles an hour, the distance between the doorway and the center of the runway crossing would be traversed in less than one second. At the time the plaintiff was injured the locomotive came out of the doorway at its usual rate of speed. Wooley, the superintendent of the mill, testified that the locomotive, which came through the doorway at the time of the plaintiff's injury, was nineteen feet and four and one-half inches long, and that in his judgment, at the rate of speed at which such engines move, namely, from four to six miles an hour, they could be stopped in about their own length, and that that would be a very quick stop. He further testified to the effect that about the time the plaintiff was injured a locomotive would come out of and return through the doorway about seventy one times in the course of one night; that in the course of twenty-four hours about eight hundred crossings of the narrow gauge track where the plaintiff was injured were made by operatives of the defendant; and that nearly as many crossings were made at that point at night as in day time. He further testified: "Q. I have understood you to say, in answer to Mr. Demming, that there were new and old men among these men who wheel the barrows? A. Yes, sir. Q. Can you give any idea of the proportion you always have of new men on these jobs? A. I could hardly say that. There is hardly a day passes that we have not a new man or two or three or four." He further testified to the effect that it was the custom to put new men at such work as would compel them to use the runway and crossing in question, and that he, the witness, was in the habit of so putting new men at work at that place. There is evidence to the effect that sometimes a locomotive pulled a car or cars and at other times pushed a car or cars through the doorway in question across the runway. When the plaintiff was injured the locomotive was pushing a car laden with moulds. No person was on the car, nor did it carry a light. Wooley testified that the moulds carried out in the cars were "hot; a very dull red and dark." Such cars pushed by the locomotive, in so far as they intervened between the vision of a person standing at the point where the plaintiff was injured and a locomotive pushing such car, of course, rendered the locomotive invisible to him. It appears from the evidence that the mould yard was used principally for the purpose of cooling the hot moulds which were taken from the mill; water being turned on the moulds for that purpose. The cooling of the moulds in this manner resulted in large quantities of steam which either hung over the yard or was carried in one direction or another by the wind. Tomaney testified to the effect that the steam from the moulds obscured the electric light hung in the mould yard. There was some conflict of testimony as to the extent to which the light was thus obscured. It appears from the evidence that the customary means of warning persons in the mould yard of the approach of locomotives or cars from the mill was blowing the whistle of the locomotives while within the mill and some twenty five feet from the doorway. While two such locomotives called dinkey engines were employed in and about the mill and mould yard of the defendant at the time the plaintiff met with his injury, usually three such locomotives were used. The operations carried on in the mill

were of such nature as to produce a confusion and mingling of loud noises of various kinds incident to a mill of that character. Tomaney testified that there were noises in the mill from stationary engines and bessemer cupolas. Julien testified to the effect that the three locomotives whistled "every place wherever they go"; that they whistled both when they passed out of the mill and when they passed into the mill; that they whistled as they passed back and forth within the mill, when not intending to pass out; and that the locomotives "always whistle, they are always going, never stop." Under the circumstances disclosed and especially in view of the proximity of· the runway crossing to the doorway, it is evident that the custom of signaling by whistle was not calculated adequately to protect an inexperienced operative, such as the plaintiff was, having occasion to use the runway crossing; and this is all the more apparent in view of the fact that at most only two or three seconds could elapse between the time when a person on the runway crossing within one foot of the nearer rail could, under the most favorable circumstances, first see a car or locomotive coming round the sharp curve on its way out of the mill, and its reaching the spot where he stood. On the runway crossing lurked sudden death or mutilation for those who used it without exercising the utmost vigilance. An operative, wheeling a heavily laden barrow six feet long and stumbling or making a misstep while a locomotive or car was moving on its way out of the mill, would incur grave peril of loss of life or limb. The runway crossing was, by reason of the mode in which the defendant carried on its operations, a peculiarly hazardous place. There was some evidence relating to the nature of the caution generally given to new men about the danger resulting from the movements of locomotives. This evidence, however, is vague, indefinite and unsatisfactory. Barnes, the foreman of the bessemer department, testified: "As a rule I generally cautioned the men about the tracks to be crossed and the locomotive coming out on the tracks." Wooley testified: "Q. Isn't it your habit to warn those men in regard to locomotives when they are employed? A. The foremen generally warn them. Q. As a matter of fact, they are all supposed to be warned, are they not? A. No; I can't say that. Q. It is the custom to warn them all, is it not? A. Not particularly about the locomotives, no, no more than anything else about the works. Q. You warned them in regard to all the dangers of their employment? A. Of their employment. * * * Q. You also said in answer to Mr. Demming that it was your custom generally to warn men. What kind of warning do you give them? A. If the foreman hires a man, he turns them over to the gang in which he is to work, and the man understands it, without being told every time, to tell him what the work is, and he can certainly see without being told, although he is very often told, and I think as a rule told, where the dangers are, if there are any particular ones, and to avoid them." In point of fact the evidence does not disclose that the plaintiff was cautioned at or after the time of his employment by the defendant. On the contrary, the testimony shows that he was not. Such a caution or warning as is above indicated, had it been given,

was manifestly inadequate and of little importance in so far as the runway crossing is concerned. Certainly every person of full age and sound mind, who has seen locomotives or cars moving along tracks, is supposed to know that if he steps on the railway directly in front of an approaching locomotive or car and remains there until struck, he will be liable to loss of life or limb. And so every reasonable man must regard a railway, which is operated, as in itself a warning of danger, putting him on his guard. But the giving of information only as to these points is of small avail. Any sane adult possesses such knowledge without instruction from his employer. It appears from the evidence that the only rule established by the defendant for the protection of operatives using the runway crossing against locomotives or cars emerging from the doorway, was that a whistle should be given by the locomotive as a signal of its approach. But this signal, in view of the physical environments of the runway crossing and the noisy din and confusion of whistles within the mill, was, in my judgment, clearly an inadequate caution or warning to new and inexperienced operatives using that crossing and unable properly to locate and distinguish the sounds within the mill. The evidence does not show the existence of any rule requiring operatives about to use the runway crossing to stop before going upon it. And, had any such rule existed, it would be proper for the jury to pass on its sufficiency with respect to inexperienced employés. For a man, burdened with a heavily laden wheelbarrow, undertaking, even after stopping to go across the tracks, was liable to be struck and killed within one second from the time a car or locomotive should project beyond the doorway, and within two or three seconds from the time when, under the most favorable circumstances, he could have seen from the crossing the approach of a locomotive or car. It could hardly be expected, and evidently was not intended by the defendant, that operatives before crossing the tracks should leave their wheelbarrows and go through the doorway to ascertain whether a car or locomotive was approaching. There was no rule that this should be done; the defendant relying only on the whistle as a signal. Owing to the large number of crossings made each night, it was probably impracticable that it should be done. And if it had been done, the operatives would, on returning to their wheelbarrows, have been subject practically to the same peril as if it had not been done. New and inexperienced operatives were entitled to a reasonably proper and sufficient warning of the peril, and such a warning does not mean a general warning to look out for cars and locomotives given at the inception of the employment, but, in a case like this, a reasonable and sufficient warning given to the operatives at the time a locomotive or car was about to cross the runway. The warning should have been timely, and the approach of a locomotive or car marked the right time. An obviously proper rule for the giving of such warning would have required an operative, when a locomotive or car was about to emerge from the mill, to be stationed at the doorway or to precede the locomotive or car. In such case, it would not have been necessary that a locomotive or car, about to pass from the mill across the runway, should stop.

While the defendant was not an insurer of the safety of the plain-tiff at the time he received his injuries, and while the plaintiff, when he entered the service of the defendant, assumed the ordinary and usual risks of his employment, including the risk of injury from the negligence of his fellow servants, in the absence of negligence on the part of the defendant in their selection or retention, he did not assume any risk resulting from the defendant's negligence, nor had the defendant any right to expose him to unusual and unnecessary peril against which the defendant by the exercise of reasonable care could guard him. The plaintiff had the right to assume that he would not be exposed to such peril. The evidence does not show any necessity for the maintenance of the runway and runway cross-ing in such close proximity to the mill. Had the plaintiff's service in the employ of the defendant been of long continuance, and had he become thoroughly familiar with the noises in the mill and the mode in which the defendant operated its cars and locomotives when passing through the doorway, a case materially different from the one in hand might be presented. But the plaintiff, as a new and inexperienced operative, had a right to rely upon greater care, con-sideration and protection, than he received from the defendant. It was his right that the defendant should use reasonable care and pre-caution for his protection at the runway crossing.

In Improvement Co. v. Stead, 95 U. S. 161, Mr. Justice Bradley, delivering the unanimous opinion of the court, in speaking of a railway grade crossing on a common road, said:

"The train has the preference and right of way. But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It cannot be such, if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot; but the velocity of the latter generally outstrips the warning. The speed of a train at a cross-ing should not be so great as to render unavailing the warning of its whistle and. bell; and this caution is especially applicable when their sound is ob-structed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing."

So, here, the defendant, in view of the surroundings of the runway crossing, should have adopted and promulgated a rule for the pro-tection of new and inexperienced operatives requiring someone to stand at the doorway or precede locomotives or cars emerging from the mill. Had the defendant adopted and promulgated such a rule and used reasonable circumspection to secure its enforcement at all times, the negligent omission of the operative or operatives de-tailed or designated for that purpose in any given instance to carry out the rule, might be considered negligence with respect to an executive detail of the operation of the defendant's plant, and, as such, not to involve the defendant in any liability for an injury received through such negligent omission. But it is unnecessary to further pursue this particular branch. In my judgment, the defendant was culpably negligent, with respect to the plaintiff, in

not establishing such a rule.    The above points relating to the neg-
ligence of the defendant, if not, indeed, sufficient to establish such
negligence as a matter of law, should certainly have been freely
and fully left for consideration by the jury.    Were they so left?
If not, in view of their important bearing upon the case, there was
reversible error.    In Starr v. U. S., 153 U. S. 614, 14 Sup. Ct. 923,
Chief Justice Fuller, delivering the opinion of the court, in speaking
of the proper functions of a judge in charging juries, said:

"But he should take care to separate the law from the facts and to leave the
latter in unequivocal terms to the judgment of the jury as their true and
peculiar province.  McLanahan v. Insurance Co., 1 Pet. 170, 182.  As the
jurors are the triers of facts, expressions of opinion by the court should be so
guarded as to leave the jury free in the exercise of their own judgments.
They should be made distinctly to understand that the instruction is not
given as to a point of law by which they are to be governed, but as a mere
opinion as to the facts to which they should give no more weight than it was
entitled to."

The seventh assignment of error is as follows:

"(7) The learned judge erred in instructing the jury as follows:  'I feel
it to be my duty to say to you that I do not think the evidence justifies a
conclusion that the defendants failed in their duty in this particular.  I do
not take the question from you; I submit it to you; the responsibility will
be upon you of deciding it justly.  But you ought not to reach a conclusion
on the subject without the exercise of great care, and the best judgment you
possess.  You cannot undertake to say how an establishment like this shall
be constructed, how the railroad shall be located, what will answer its pur-
poses, and what will not.  You have not the information necessary to
enable you to form a reliable judgment.  The real question here in this
respect is, whether or not proper warning was given to this man at that
crossing, or whether he was misled respecting it, for want of proper informa-
tion.  These are the questions, and the only questions that the court sees
as respects this branch of the case, and I repeat what I have said, that in
the judgment of the court, the evidence on one side and the other, properly
considered, does not justify a conclusion that the defendant omitted, or failed
in, any part of its duty in this matter.  I repeat, however, so that you will
not misunderstand me, that the question is one of fact, which is submitted
to you.  If you find that the defendants were not negligent, your verdict will
be in their favor.' "

The learned judge below, in this portion of the charge was deal-
ing principally with the sufficiency of a locomotive whistle as a
warning of danger and with the knowledge of the plaintiff of the
situation generally.    On these points, while expressing his opinion
adversely to the plaintiff, the learned judge nevertheless left them
for the decision of the jury.    But language was used which virtually
took away from the jury the right to determine whether the defend-
ant was not culpably negligent toward the plaintiff, in failing to
adopt a rule requiring warning to be given of the approach of a loco-
motive or car by an operative stationed at the doorway, or preceding
the locomotive or car.    The learned judge said:

"You cannot undertake to say how an establishment like this shall be con-
structed, how the railroad shall be located, what will answer its purposes,
and what will not.  You have not the information necessary to enable you
to form a reliable judgment."

The jury was thus told in effect that they had not the informa-
tion or the power to decide whether the defendant was not at fault

for omitting to adopt such a rule as is above indicated. The jury, however, in my judgment, had that right. Neither the rule of damnum absque injuria nor any other principle of the law deprived the jury of that right. I am, therefore, of the opinion that fatal error was committed which requires the reversal of the judgment of the court below and the granting of a new trial.

With respect to alleged error in the charge touching contributory negligence I fully concur with the presiding judge in his views on that subject.