# VIRGINIAN RY. CO. v. ARMENTROUT.
## No. 5682.

Circuit Court of Appeals, Fourth Circuit.
Feb. 19, 1948.

Fletcher W. Mann, of Beckley, W. Va., (John R. Pendleton, of Princeton, W. Va., and J. O. Atkinson, of Norfolk, Va., on the brief), for appellant.

R. G. Lilly and A. A. Lilly, both of Charleston, W. Va., for appellee.

Before PARKER, SOPER and DO-BIE, Circuit Judges.

PARKER, Judge.

This is the second appeal in the distressing case of the infant whose hands and portions of whose arms were cut off by a backing locomotive in Raleigh County, West Virginia. On the first trial of the case, the jury failed to agree on a verdict. On the second trial, verdict was given for the plaintiff in the sum of $100,000, which we set aside, awarding a new trial for errors in the charge of the Court. Although we did not find it necessary at that time to pass upon whether a new trial should have been awarded on the ground that the verdict was excessive, we ad-

verted to the question in the opinion and pointed out that the jury had been allowed to pass upon elements of damage not proper for their consideration. See 158 F.2d 358. Upon the new trial the jury awarded a verdict for $160,000, which the trial judge sustained in denying a motion to set it aside as excessive, notwithstanding the affidavit of a juror that it was a quotient verdict. Three questions are presented by the appeal: (1) whether there was error in the admission of certain evidence and in permitting comment on an evidentiary matter; (2) whether there was error in the charge to the jury in unduly disparaging the testimony of the engineer in charge of the locomotive; and (3) whether there was an abuse of discretion in refusing to set aside the verdict as excessive.

The first question presents no matter of sufficient merit to justify discussion. There was objection to photographs on the ground that they had not been taken from the right place and to evidence of experiments on the ground that a proper foundation of fact had not been laid for them. If plaintiff's version of the facts be accepted, however, there can be no question as to the admissibility of this evidence, which was, at all events, a matter resting very largely in the discretion of the trial judge. Evidence that the engineer turned aside to wave at his daughter 1500 feet from the scene of the accident was objected to but was clearly admissible for the purpose of showing his position in the engine and what he was doing shortly before the accident occurred. Objection to the comment on the failure of defendant to make a stopping test is sufficiently answered by our former opinion in the case, wherein we said: "We do not question the right of plaintiff to comment on the failure to make the test".

The second question, which relates to the disparagement of the testimony of the engineer operating the locomotive, is one of very different character. The only questions of fact in the case arose in connection with the engineer's discharge of his duty as to keeping a proper lookout and using due care in stopping the engine; and with respect to all of these matters, he was defendant's principal witness, and the only witness who saw the accident. He testified he was keeping a proper lookout and that, as soon as he recognized that an object, which he first saw on the track a few seconds before the accident, was a baby, he applied the independent brake, sanded the rails and reversed the engine. This he contended was the proper procedure under the circumstances. In discussing his evidence as to these matters, the trial judge not only made argument in answer thereto but did so in such way as to disparage his statements and to imply that he was testifying falsely.

On the question as to whether the engineer sanded the rails at the time of applying the brakes and reversing the engine, there was a conflict of evidence as to sand being found on the rails afterwards; and, as to this, the court charged:

"There was conflicting evidence about sand on the rails and you will have to determine what to believe about that. That is not of great importance in this case, only as affecting the credibility of Mr. Murdock's other testimony.

"You see, as I told you a while ago, if you think that a witness testifies falsely about something, you don't need to believe him on anything, so if you believe that Murdock said he sanded the rail, knowing that he did not sand the rail, then that would be a false statement and you would not have to believe anything he said."

To show that the engineer was not keeping a proper lookout, plaintiff introduced three boys, two of whom testified that when about 300 feet from the crossing the engineer was waving to them. The two who so testified were brothers of the injured infant. The engineer denied waving to the boys and at one of the former trials testified that he could not have done so because of the way in which he was sitting in the cab. In this trial, when questioned on cross examination as to how he could wave at his daughter but could not wave at the boys, he answered that he meant he could not wave at them without turning around. This answer which seems

upon its face to be reasonable and honest, was held up in the charge as an admission of falsehood and the falsus in uno falsus in omnibus rule applied to it as well as to the evidence with regard to sanding the rails; for, immediately after the portion of the charge just quoted, the court proceeded to say: "There were some contradictions that I think should be called to your attention in the evidence of two witnesses for the defendant. It is possible there may have been some contradictions in the testimony of the witnesses for plaintiff. I don't remember any particular ones. I am talking about contradictions now between what evidence they give at this trial and evidence they gave at a former trial in this case. Murdock had said at a former trial of this case that in the position in which he was sitting, when he testified that he was sitting in the same position that he was when he waved to his daughter so that we know that when he said before it was impossible, sitting in that position, to wave at his daughter, that that wasn't so—I mean to wave at these boys—that wasn't so, because he shows now that it was possible—not only possible, but he had done it just a minute before that."

The court similarly disparaged the testimony of the fireman Jackson, who had testified that the engineer was looking ahead and thus corroborated him on this crucial matter. Immediately following the charge above quoted, the judge said: "Mr. Jackson, in the former trial, testified to the effect that he hadn't noticed what Mr. Murdock was doing just before the accident. In this trial, he testifies that he looked at him—out of the corner of his eye it is true—nevertheless, he says, 'I looked at him' and that 'he was looking straight ahead and wasn't looking out the window'. That is a contradiction and you are entitled to draw conclusions from it."[1]

---

[1] On direct examination Jackson testified:

"Q. As your engine approached that crossing, back 150 or 200 or 300 feet, was Mr. Murdock waving at anybody upon the hillside there? A. Not as I saw, no sir.

"Q. If he had been waving at somebody upon on the hill there, as the engine run for a distance of 150 feet, would you have seen him? A. Yes, sir, I probably would have.

"Q. Which way did he have his face turned at that time as he approached that crossing? A. Well, as far as I can remember, he was looking through this glass in the back of the cab.

"Q. Back of the cab? A. Yes, sir."
On cross examination he said:

"Q. Now, I am asking you whether you know in what direction Mr. Murdock was facing as you approached? A. Just as we approached the crossing, I glanced at Mr. Murdock. He was looking through the glass.

"Q. What do you mean he 'was looking though the glass'—where, from the crossing? A. I don't know how close we were to the crossing; it wasn't far.
* * *

"Q. You don't know whether Mr. Murdock was waving at those boys as he passed through there or not? A. I didn't see him waving at the boys.

"Q. I say, you don't know whether he was doing it or not? A. Not to my knowledge.

"Q. The Court: The question was, do you know that he wasn't?

"A. No, sir, I didn't see him waving at anyone.

"The Court: That isn't the question. Do you know he wasn't waving?

"A. I didn't see him.

"The Court: Answer—Do you know he wasn't waving?

"A. No, he wasn't.

"The Court: That isn't the question. Do you know he wasn't waving? A. Well, sir—

"The Court: (Interrupting) You know whether you do or not. Do you know that he wasn't waving at somebody?

"A. I didn't see him waving, no, sir.

"The Court: Can you answer me, do you know he wasn't waving?

"A. (No reply).

"The Court: All right. Go ahead.

"Q. (By Mr. Lilly, continuing) Now, Mr. Jackson, I will ask you to state whether or not when you were a witness in this case in December, 1945, if you didn't tell the jury at that time that you didn't know whether Mr. Murdock was waving or not, that he might have been waving, that you were paying no attention to him, that you were looking straight ahead and paid no attention to what he was doing until he suddenly whirled and started working the brake and so forth, didn't you tell the jury that? A. Yes, sir.

"The Court: Did you say 'Yes'?

"A. Yes.

How differently the court treated plaintiff's testimony, when one of the three boys introduced by plaintiff testified that he did not see the engineer wave, is shown by the following portion of the charge:

"First, let me comment on the incident that was spoken of in the evidence, of the boys playing in the field. There were three boys, I believe, who testified, two of them brothers to this child, the other a friend of those boys. These two boys who were brothers said that they saw the engineer turn around and wave his hand; therefore, that he was not looking out in front as he should have been. The other boy said he was there, but he didn't see the engineer wave.

"Now, it was argued by counsel for the defendant, it was argued in two different ways. One argument by Mr. Mann was that because nobody saw those boys after the accident, and because the engineer didn't know them, and several other reasons that he gave, he concluded that the boys were not there at all. Then the argument of Mr. Pendleton was that because the Hamilton boy was looking at the engine and did not see the engineer wave, then the inference is that the other boys were not telling the truth.

"Now, it seems to me that you may draw such an inference as Mr. Pendleton argued, but of course if you do that, you would decide that the boys actually were there playing in the field; and by the way, the evidence, as I understood it, was not that this field was between the house and the crossing but that the field was farther down and probably up on the hill by the barn. So you could logically infer, and I believe should infer, that the boys were there; but you may draw the inference, as Mr. Pendleton argued, that this engineer did not wave, because there was a boy looking and reading the '805' on the side of the engine, and he didn't see the engineer wave, although the engineer was right there sitting just above that number '805'. But you would also be justified, too, in taking into consideration the fact that when different people see the same occurrence they don't always remember it alike, and also, the fact that the Hamilton boy said on the witness stand that he didn't see the engineer wave is a pretty good indication that this wasn't just manufactured testimony. Certainly if the plaintiff wanted to manufacture testimony, and produced three boys who said they were playing, he wouldn't have had two of the boys say they saw the engineer wave and the other boy say he didn't see the engineer wave. The logic of that situation would naturally lead to the inference that the testimony at least was not manufactured by the plaintiff, although it may have been manufactured by the two younger boys."

There was a conflict in the testimony as to whether the action of the engineer in applying the independent rather than the automatic brake was the exercise of due care under the circumstances. After calling attention to this conflict, the court recited evidence to prove that by use of the automatic brake the engine could have been stopped in time to avoid striking the child. He then proceeded as follows:

"Now, I should caution you about this though, that the mere fact that the automatic brake would have stopped the train where the independent brake did not, that in itself would not justify finding negligence; you must find also that Murdock as an experienced engineer knew or should have known that that was the brake to use to make that quick stop. Now, if he knew that, or he should have known it as a competent engineer, and he used the wrong brake you would be justified from

---

"The Court: Then why do you tell them something else now?

"A. Well, he asked me if I knew that Mr. Murdock wasn't waving. Well, I was paying attention to where I was going.

"The Court: I want to know why you are telling the jury something different now from what you told them in the other trial?

"A. I answered the question to the best of my knowledge, sir.

"The Court: Do you have any explanation why you are telling a different story now than you told in the other trial?

"A. No, sir. I was asked that question and I answered the best I knew how."

that in inferring—and if you think that negligence caused the injury—you would be justified in rendering a verdict on that account.

"It is argued to you that Murdock used other means in addition to the independent brake and that altogether it made the most effective stop; but so far as I can see, there is no logical reason why he could not have used all those other means that he did use, along with the automatic brake. He says that he used the independent brake, which is just as hard to operate, or maybe a little harder under the evidence, as the automatic, because the evidence is the automatic brake can be applied just by the sweep of your arm, whereas there is some question in the evidence as to how long you would have to hold onto the independent brake. Anyhow as I said, I don't see anything against the logic of this inference that he could have used all those means—sand, reverse lever and changing his throttle and everything that he said he did use with the independent brake, why he could not have used all that with the emergency brake just the same."

■ It was proper, of course, for the judge to array the evidence and comment upon it; but what the law envisions in this regard is judicial comment fairly explaining to the jury the contentions of the parties with respect to the evidence, not argument by the court in support of contentions. The judge occupies a position of great influence with the jury in conducting a trial; and while he should not hesitate to exercise the power of comment to clear away false issues and lead the jury into a proper understanding of the facts, he should be careful not to assume the role of counsel or to say anything which might have the effect of prejudicing the cause of either party before those whose duty it is to decide on the facts. Graham v. United States, 4 Cir. 12 F.2d 717; Pullman Co. v. Hall, 4 Cir. 46 F.2d 399, 404, Id. 55 F.2d 139; Weiss v. Bethlehem Iron Co., 3 Cir. 88 F. 25, 30; Hall v. Weare, 92 U.S. 728, 23 L.Ed. 500; Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 699, 77 L.Ed. 1321. In the case last cited the rule was ably stated by Chief Justice Hughes as follows: "This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. * * * His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received' with deference, and may prove controlling'. This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'".

■ It was especially damaging to defendant's cause for the trial judge here to charge the falsus in uno falsus in omnibus rule in connection with the conflict of testimony relating to sanding the rails and the position of the engineer in the cab. The sanding of the rails was a matter as to which, in the excitement attending the accident, there could have been mistake of recollection; and what was said by the engineer as to his position in the cab could well have been the result of misunderstanding in the use of language. There was no occasion to apply to such testimony the harsh falsus in uno falsus in omnibus rule, which has little or no place in modern jurisprudence. That rule arose when conviction of felony disqualified a witness; and it was based on the reasoning that, since perjury was a felony, the jurors should disregard the testimony of one whom they found to have perjured himself in the trial before them. The rule has been watered down until it means no more now than that the jury may disbelieve a witness if they think he is lying; but they need no instruction as to that and giving it with respect to a particular witness accomplishes nothing except to convey to the jury the impression that the judge thinks that the witness has lied. As was well said by Prof. Wigmore in his great work on evidence, 2d Ed., vol. 2 p. 449:

"It may be said, once for all, that the maxim is in itself worthless, first, in point of validity, because in one form it merely contains in loose fashion a kernel of truth which no one needs to be told, and in the others it is absolutely false as a maxim of life; and secondly, in point of utility, because it merely tells the jury what they may do in any event, not what they must do or must not do, and therefore it is a superfluous form of words. It is also in practice pernicious, first, because there is frequently a misunderstanding of its proper force, and secondly, because it has become in the hands of many counsel a mere instrument for obtaining new trials upon points wholly unimportant in themselves."

■ We think that the reference to the rule in connection with the testimony of the engineer was most unfortunate in that it tended to discredit the witness upon whom the defendant's entire defense rested, and did so without any real justification that appears of record. Even if it were a proper rule to apply in some cases, there was no reason to apply it here; and its prejudicial effect was manifestly not removed by the charge given after the taking of defendant's exception. This did no more than instruct the jury that they were to judge as to whether there had been any contradiction in the testimony of a witness and repeat that, upon the finding of a contradiction, they might consider this in determining whether they would believe the witness' testimony.

It is a reasonable assumption that this prejudicial charge to which exception was taken influenced the jury adversely to defendant and was a contributing factor in causing the jury to return a verdict in an excessive amount. We feel that we should notice also, in this connection, certain passages of the charge relating to the question of damages, which, although not excepted to, have an important bearing on the question of setting aside the verdict, since they must have influenced the jury adversely to defendant. The first relates to an admonition to the jury that this was the only time plaintiff could recover of the defendant and that they should not give him "a single cent" less than his damage. Although the jury were told at the beginning of the charge that they were not to be guided by sympathy in arriving at a verdict, there was no repetition of this thought when the measure of damages was specifically dealt with and when because of the pitiable nature of the case, extra caution was necessary. On the contrary, the jury were told at that point: "* * * if you determine that there is liability, then it is your duty to give exactly what you think will fully compensate this child for its injuries. I know it is hard to arrive at any figure of that kind, but you must realize that there is only this one chance to do it. Never again after the verdict of this jury, never again can the child bring any suit or recover anything for any injury that has been done to him. So he is entitled to the full value of the damage as estimated as best you can. He is not entitled to any more than that, not a single cent more and you should not give him a single cent less."

■ It is perfectly clear that in a case involving so much emotional appeal, the judge should not have emphasized plaintiff's right to a full recovery in any such way. See 15 Am.Jur. 809; Sale v. Eichberg 105 Tenn. 333, 59 S.W. 1020, 52 L. R.A. 894. In a case between an injured infant and a foreign railroad corporation there would seem to be no occasion to warn a jury against returning too small a verdict; and such a warning is but an encouragement to return a verdict based on sympathy.

■ Another passage of the charge involving a damaging suggestion to the jury to be guided by sympathy was one wherein the jury was told: "You know that the child will undergo much humiliation by reason of this disfiguring accident. You can appraise that by thinking of what would be your own humiliation and sense of mental suffering if you had to go through life with one arm off above the elbow and the other arm off below the elbow."

That instructions of this sort should be avoided, see Kekler v. Chwenk, 144 Pa. 348, 22 A. 910, 13 L.R.A. 374, 27 Am.St. Rep. 633; Rhodes v. Union R. Co., 52

Misc. 501, 102 N.Y.S. 510, 15 Am.Jur. p. 809.

We cite these portions of the charge to which exception was not taken for the purpose of showing that the portion excepted to as disparaging the testimony of the engineer was not an isolated matter, which might or might not have affected the result, but was part of an argumentative presentation of the case which must necessarily have prejudiced defendant's cause and led the jury to return a verdict which seems to us so manifestly excessive that it cannot be justified.

And quite apart from the error in the charge, we think the trial judge erred in refusing to set aside the verdict as excessive and grant a new trial. Ordinarily, of course, the amount of damages is for the jury, and whether a verdict should be set aside as excessive is a matter resting in the discretion of the trial judge. This, however, is not an arbitrary but a sound discretion, to be exercised in the light of the record in the case and within the limits prescribed by reason and experience; and where a verdict is so excessive that it cannot be justified by anything in the record or of which the court can take judicial notice, it is the duty of the judge to set it aside. Failure to do so is an abuse of discretion, analogous to error of law, and as such reviewable on appeal.

There can be no question that the award of $160,000 here was greatly in excess of any proper award. An infant thirteen months of age, without any established earning capacity, is awarded for an injury that deprives him of the use of his hands a sum which at 3% interest, a conservative estimate of return, would pay him $4,800 per year as long as he lives and enable him to leave the entire recovery of $160,000 intact at his death. This income from interest alone would be, beginning with infancy and continuing through life, $1,000 per year more than the trial judge estimated that the annual earnings of the child would have been after reaching maturity, if he had not been injured, and $1,800 per year more than he estimated the annual loss of earning power. The workmen's compensation laws of West Virginia provide maximum compensation of $18 per week or $936 per year for totally disabling injuries of this sort. See 1947 Supplement to West Virginia Code of 1943, sec. 2531. The present worth of an annuity of double this amount, based upon 3% interest, for a sixty year period is less than $60,000, which is $100,000 less than the verdict rendered. The present worth of such an annuity of $3,000 per year, the loss of earning power estimated by the judge, would be less than $85,000, or but little more than half of the verdict awarded. Surely, no such verdict should have been allowed to stand. The fact that the judge in his lengthy opinion refusing a new trial computed the earning power of money at 2%, when it is a matter of common knowledge that even estates conservatively invested earn a higher rate at this time when the earning power of money is abnormally low, and that he assumed in favor of plaintiff that income taxes for the future would be thirty percent less than their present rate, demonstrates that in refusing to set aside the verdict he acted upon hypotheses that cannot be sustained.

The problem of assessing damages in a case of this sort is one which must be approached with common sense. The little child has been terribly injured; but there is nothing from which loss of earning capacity can be estimated with any degree of accuracy. The jury must do the best it can to estimate this, taking into account, of course, such matters as average earnings. They can consider, also, that the child is bright and intelligent and with proper education may be able to develop high earning capacity in intellectual pursuits. While pain, suffering and humiliation are to be considered, it should also be considered on the matter of humiliation whether one who has suffered the deprivation of a member in infancy is likely to feel the same sense of humiliation from it as does one who sustains the loss later in life, and whether mechanical aids, which science has brought to a high state of development as a result of experimentation for the benefit of soldiers

wounded in the late war, may not enable him to overcome this in considerable measure. All of these matters should be taken into account and an amount awarded which in the opinion of the jury will fairly compensate for the injury inflicted. It is for the jury to fix the amount but they must do this within the bounds of reason, and a verdict on which the mere interest at 3% amounts to more than five times the maximum allowed by the state compensation laws and $1,800 per year more than the judge estimates the loss of adult earning power is manifestly too much.

■ The power and duty of the trial judge to set aside the verdict under such circumstances is well established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right. Smith v. Times Pub. Co., 178 Pa. 481, 36 A. 296, 35 L.R.A. 819; Bright v. Eynon, 1 Burr. 390; Mellin v. Taylor, 3 B.N.C. 109, 132 Eng.Reports 351. The matter was well put by Mr. Justice Mitchell, speaking for the Supreme Court of Pennsylvania in Smith v. Times Pub. Co., supra, 178 Pa. 481, 36 A. 298, as follows: "The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,—a power exercised in pursuance of a sound judicial discretion, *without which the jury system would be a capricious and intolerable tyranny,* which no people could long endure. This court has had occasion more than once recently to say that it was *a power the courts* ought to exercise unflinchingly." (Italics supplied.)

To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require. Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350.

■ The power of this court to reverse the trial court for failure to exercise the power, where such failure, as here, amounts to an abuse of discretion, is likewise clear. It is true that under section 22 of the Judiciary Act of 1789, 28 U.S.C.A. § 879, there may be no reversal on writ of error for any error in fact; and this rule has been frequently applied where reversal is sought because damages are excessive or inadequate. Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439. We do not understand the rule to have application, however, in those exceptional circumstances where the verdict is so manifestly without support in the evidence that failure to set it aside amounts to an abuse of discretion. In a situation of that sort, reversal is no more based on "error in fact" than reversal for refusal to direct a verdict for insufficiency of evidence. Whether there has been an abuse of discretion is a question of law in the one case, just as is the legal sufficiency of the evidence in the other. An appellate court is not required to place the seal of its approval upon a judgment vitiated by an abuse of discretion.

That refusal to set aside a verdict which is grossly excessive constitutes an abuse of discretion reviewable on appeal is held directly in Cobb v. Lepisto, 9 Cir., 6 F.2d 128, 129; W. T. Rawleigh Co. v. Shoultz, 3 Cir., 56 F.2d 148; Department of Water & Power v. Anderson, 9 Cir., 95 F.2d 577, 586; Pettingill v. Fuller, 2 Cir., 107 F.2d 933, 936. In the case last cited Judge Augustus Hand, speaking for a court composed of himself, Judge Learned Hand and Judge Clark, stated the rule applicable as follows: "In spite of the fact that the courts of the United States have been most loath to review orders granting or denying motions to set aside verdicts, it is implicit in the opinion of Justice Brandeis in Fairmount Glass Works v. Cub Fork Co., 287 U.S. 474, 483–486, 53 S.Ct. 252, 77 L.Ed. 439, that they may do so in certain

cases, one of which would seem to be an abuse of the trial judge's discretion. 287 U.S. at p. 485, 53 S.Ct. 252, 77 L.Ed. 439. There a review was declined because there was no explanation by the trial judge of his refusal to set the verdict aside and the record did not show that the verdict was clearly erroneous and arbitrary. * * * That such an order may be reviewed on an appeal from a final judgment is undoubted unless the exercise of judicial discretion involved in making it is beyond the correcting hand of a court of appeal, no matter how arbitrary it was. We think that Justice Brandeis in Fairmount Glass Works v. Cub Fork Co., 287 U.S. 474, 485, 53 S.Ct. 252, 77 L.Ed. 439, evidently regarded such orders as reviewable. Indeed, the dissenting Justices (Stone and Cardozo, JJ.) held that the court of appeals properly reviewed and reversed an order granting a new trial where the trial court had abused its discretion in refusing to set aside a verdict for nominal damages rendered by a jury in plain disregard of the evidence."

 That abuse of discretion in refusing to set aside a verdict is an exception to the rule that the granting or refusing of a new trial is not assignable as error, is definitely recognized in the following decisions: Detroit Transfer Co. v. Pratt, 6 Cir., 2 F.2d 193; Carter Coal Co. v. Nelson, 4 Cir., 91 F.2d 651, 654; Western Union Tel. Co. v. Dismang, 10 Cir., 106 F.2d 362, 364; Southern Fruit Distributors v. Fulmer, 4 Cir., 107 F.2d 456, 459. In the case of Carter Coal Co. v. Nelson, supra [91 F.2d 654], this court, speaking through Judge Soper, said: "The established rule in the federal appellate courts is that they have no power to review the action of a trial court in granting or denying a motion for a new trial for error of fact. Such a matter lies wholly within the discretion of the trial court and *it is only when there is an abuse of such discretion that its action is reviewable.*" (Italics supplied.)

The matter is fully discussed with annotations in 2 Am.Jur. 907, 911, where, after saying that "the granting or refusing of a motion for a new trial, filed after a general verdict, is largely a matter of discre-

tion, and that the action of the court in this respect is only reviewable for an abuse thereof", the rule is stated that "the discretion of the court in granting a new trial in the above cases is not absolute, and the appellate courts have not hesitated, where an abuse of discretion has been shown, to reverse the action of the lower court". And, in one of the cases cited, reference is made to the rule of manifest wisdom that "a court of review will more reluctantly interfere with the action of the trial court in granting a new trial than in refusing one". Strode v. Strode, 194 Ky. 665, 240 S.W. 368, 370, 27 A.L.R. 313.

For the reasons stated, the judgment appealed from will be reversed and the cause will be remanded for a new trial.

Reversed and remanded.