**SOUTHERN PAC. CO. v. GUTHRIE.**

No. 12164.

United States Court of Appeals
Ninth Circuit.

Dec. 30, 1949.

Rehearing Granted Feb. 15, 1950.

Arthur B. Dunne, Dunne & Dunne, San Francisco, Cal., for appellant.

Thomas C. Ryan, Daniel V. Ryan, Ryan & Ryan, San Francisco, Cal., for appellee.

Before BONE and POPE, Circuit Judges, and BLACK, District Judge.

POPE, Circuit Judge.

Southern Pacific Company has appealed from a judgment recovered against it by Garry T. Guthrie in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The contentions most strenuously urged by appellant are (1) that there was no evidence of negligence on its part, and (2) that the dam-

ages recovered are excessive. The company also specifies as error the refusal of the court to give numerous requested instructions, and the admission of evidence to which we shall call attention hereafter.

Guthrie was a locomotive engineer employed by the Southern Pacific Company. He had completed a run from Yuma to Gila Bend, Arizona, on the morning of October 27, 1947. Later the same day he received orders to "deadhead" to Yuma, to the west. This meant he could travel by freight, or passenger train, or both. Pursuant to these orders he took a freight train to Sentinel, Arizona, which was part way, and at that point decided to change to a passenger train, which was due to arrive shortly, in order to shorten the time required for his trip. Accordingly he waited at Sentinel for the arrival of passenger train No. 5, westbound for Los Angeles. The train reached the Sentinel yards about 9:30 P.M. and was obliged to pass through the yards on the north side passing track or siding on account of a broken rail on the main line track. This necessitated the train coming back on the main line at a switch on the west end of the siding.

The switch stand, by which this switch was operated, was north of the main line. On the other side was the station platform, where Guthrie had been waiting. When the train moved slowly through the passing track, he set his grip down on the platform and crossed over the track to the switch stand in order to throw or line the switch so that the train could come out on the main line. It was customary for engineers and other trainmen, when traveling as he was, to furnish such assistance to the train crew, and there is no question but that Guthrie was then in the course of his employment and then engaged in interstate commerce.

As he moved over to the switch stand Guthrie was standing in the full beam of the locomotive's headlight. The train was moving very slowly. The fireman had climbed down on the right hand, or engineer's side of the engine, intending to throw the switch himself, and had gone ahead for that purpose, but when he saw Guthrie, dressed as an engineer, unlock and line the switch, and give the customary signal to proceed, he waited for the engine to come along and then climbed back on the engine.

After Guthrie had thus signaled to come ahead, he started to cross the track to the south, back toward where he had left his grip. When he took the first step, with his right foot, between the rails, his foot or shoe caught in the space between the tie bar and head block or switch tie, and he could not pull it out. He shouted, but could not be heard above the engine noise and he could not be seen from either window of the locomotive cab because of the width of the engine. As the locomotive continued toward him he threw himself backward over the rail, so that he saved his left leg and body, but his right leg was run over and cut off at a point between the knee and the hip.

The appellant urges that there is no evidence of negligence on the part of the company. Under the court's charge there were submitted to the jury two claims of negligence, one that there was negligence "in connection with the maintenance of the area in and about and connected with the switch", and one that there was negligence "on the part of the fellow employees in the operation of the railroad engine". Appellant says that there was negligence in neither respect, and further, that if either of these claims must fall for want of evidence, the judgment must be reversed for the reasons stated in Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 27 S.Ct. 412, 51 L.Ed. 708, because, under the general verdict, it cannot be known upon what ground the jury went.

Guthrie gave several reasons why he crossed the track after lining the switch. He had left his grip on the side opposite the switch stand and he had to go to that side to board the train which opened up for passengers on that side. Two company rules were mentioned. One provided: "While the train is moving over a switch any employee in the vicinity of such switch must take position on the opposite side of the track from switch when practicable, and when not practicable to do so must take position 20 feet from switch stand". The

other rule was cited by Guthrie as his reason for crossing at that particular place. He said he did so in order to inspect the points of the switch. The switch points are the moveable portions of the rails, tapered at the ends, which are moved back and forth as the switch is operated. This rule provided that: "When a switch is thrown, the employee setting it must see that both points have moved to the proper position".

When Guthrie stepped between the rails his right foot was caught between the tie which is referred to as the switch tie, or head block, and the No. 1 tie rod. The switch tie is the tie which is extended beyond the other ties to furnish support for the switch stand. The tie rod connects the two switch points, so that when the switch is thrown, both rails move together. Fastened to the inside of the switch points on either side are metal transit clips, in which five bolt holes are set on an angle, and as the connecting tie rod is fastened by bolts in these holes, the correct distance between the two switch points can be maintained by moving the bolts from hole to hole. At the time of the accident the tie rod was bolted to the middle hole of the north clip and the second hole from the east on the south clip. Partly in consequence of this, the space between the switch tie and the tie rod tapered from a two inch space on the north to a four inch space on the south. Guthrie stepped into this space between switch tie and tie rod. He said that as he did so his foot went into a hole. The track was ballasted with slag, but Guthrie testified that at the point where he stepped, the ballast, instead of being in place up to within four inches of the top of the ties, was down to a depth of 7, 8 or 9 inches, sloping down toward the north, so that as he stepped his foot slipped back under the narrower portion of the space between switch tie and tie rod, and his foot became wedged in this space. He was thrown, and fell on his left side. He got up, but could not pull his foot out. He thought his leg was broken. Another witness who later picked up the severed leg thought it was broken at the ankle.

Other witnesses who examined the location a few days after the accident and while conditions at the switch remained the same, testified as to the depth of the ballast beneath the tie rod where Guthrie caught his foot. One of them said that he measured a distance of nine inches from the bottom of the tie rod to the top of the ballast at the north side of the track and that the measurement was seven inches below the tie rod at the other side of the track. Another witness testified that about the same time he examined the location and found that the top of the ballast between the two ties and inside of the two rails was nine inches below the top of the ties. According to his testimony the ballast at this point was actually slightly lower than the bottom of the ties. He described it as "saucer shaped" and said that the appearance was as if some of the ballast had been taken out.

Not only did the company produce evidence of measurements made tending to controvert Guthrie's claim that he stepped into a hole, but it attacks the claim of the existence of a hole at this point as not entitled to any credit whatever for two reasons. It says that if the ballast were actually below the bottom of the two ties, the movement and weight of the trains operating there would have moved the two ties together for want of ballast between them. It is asserted that the photographs of the locality taken shortly after the incident showed that the ballast was in a normal position and that there was no hole in which Guthrie could have stepped. With respect to the claim that the ties would have shifted, plaintiff's counsel argue that there is no claim that there was no ballast between the ties and that there is nothing to show that the ballast between the ends of the ties outside of the rails would not have been sufficient to hold the ties in place. An examination of the original photographs which are part of the record in this court does not furnish any satisfactory answer to the controversy. Obviously, the taking of a photograph of space between ties in such manner as to show depth, is an exceedingly difficult undertaking in the absence of some stereoscopic device. Exhibits 7, L and J, which are photographs, seem to indicate some extra depth in ballast at this point, while in exhibits I, K, H, and

F, also photographs, taken at the same time, the depth seems less.

The evidence does show that in ordinary railroading practice it is standard procedure to have the ballast beneath this moving portion of a switch slightly lower than the ballast elsewhere along the track. Some allowance must be made for the movement of the tie rods. It was testified on behalf of the defendant that the top of the ballast was 4½ inches lower than the top of the ties.

■ Viewing the evidence in the light most favorable to Guthrie, we believe that the jury would be warranted in believing that there was sufficient credible evidence to support a claim that when Guthrie stepped between the rails his foot was placed at a point where it was able to slide backward toward the north side of the track into a hole. An inspection of some of the photographs would tend to indicate the existence of a hole of some depth at this point. It is reasonable to believe that if a hole was near the north rail his movement toward the south would make the thrust of his foot toward the north, where he said the hole sloped off, and wedge his ankle into the narrow portion of the space between the switch tie and the tie rod. If he then, in this predicament, fell toward the left, his foot being held against the tie, the tie rod might well supply enough leverage to break his leg.

With respect to the claim of negligence in the operation of the engine, the evidence showed that the locomotive was moving very slowly when Guthrie moved over to throw the switch. Guthrie's testimony was that it was moving so slowly that he could not be sure that it was moving at all. The fireman estimated the speed to be three or four miles an hour, slow enough so that when he got down on the ground he could "get ahead of the engine by either walking or trotting slowly". The fireman had made a few steps toward the switch after getting down on the engineer's side when he saw Guthrie at the switch and that he had correctly lined the switch for the locomotive to proceed. The fireman saw Guthrie give the "come ahead" signal, saw Guthrie start crossing the track toward the south side, waited for the ladder of the engine to come to where he was standing, and after climbing up to the locomotive cab, walked across to his own side and looked for Guthrie. He saw Guthrie's grip on the ground but saw nothing of Guthrie. The fireman then went back to the other side of the engine, saw nobody there and started down the ladder. It was after that that the fireman heard Guthrie's cries and told the engineer to stop.

It clearly appears that the portion of the locomotive ahead of the cab was so wide that there was no opportunity for the engineer from his position to see Guthrie after he started to cross the track. Counsel for Guthrie placed the negligence upon the fireman in two particulars; in the first place, it is asserted that the fireman was negligent in not remaining upon the ground where he was when he saw Guthrie start to cross the tracks until such time as he had made sure that Guthrie was safely across. In the second place, it is asserted that when the fireman returned to his own station on the left side of the cab and looked for Guthrie and did not see him, he should have known that something was wrong and told the engineer to stop.

Without considering the first of these contentions, it seems that the record contains evidence which might warrant the jury in believing that when the fireman looked out and saw that Guthrie was missing there was yet time to have stopped the locomotive before it reached him. Guthrie testified that when he threw the switch the locomotive was between 200 and 250 feet away. If the locomotive was moving at three miles per hour this means it was traveling approximately 4½ feet per second. It would probably be a matter of common knowledge that since the fireman was only a few steps from the ladder when he stopped, it would not take him more than 20 seconds to climb the ladder and return to his station. Accordingly, in that time the locomotive would have traveled 90 feet, and it would still be a considerable distance away from where Guthrie was caught. It is true that the fireman placed the front of the locomotive much closer to Guthrie than would appear from Guthrie's

testimony, but the resolving of that difference would be for the jury.

A mere reference to the more recent decisions of the Supreme Court is all that is required to demonstrate that there was sufficient evidence to warrant the court in submitting both claims of negligence to the jury. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Bailey v. Central Vermont Ry. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Wilkerson v. McCarthy, 336 U.S. 53, 69 S. Ct. 413.

The evidence indicates that it was entirely proper for Guthrie to cross the track as he did. Under these circumstances, the duty to provide a safe place to work was such that under the decisions mentioned it was for the jury to say whether negligence existed in connection with the maintenance of the area in and about and connected with the switch. Cf. Southern Ry. Co. v. Puckett, 16 Ga.App. 551, 85 S.E. 809, affirmed 244 U.S. 571, 37 S.Ct. 703, 61 L.Ed. 1321, and cited in Brown v. Western R. Co., 1949, 338 U.S. 294, 70 S.Ct. 105.[1] It is even more clear, we think, that it was a jury question whether the fireman's delay in warning the engineer to stop constituted negligence.[2]

Appellant made a motion for a new trial upon the ground, among others, that the verdict is excessive and appears to have been given under the influence of passion and prejudice. It is said the verdict for $100,000 is contrary to the evidence in that it appears from its amount that no reduction in the amount of the award was made because of the contributory negligence of the plaintiff.

In this connection appellant calls attention to the comparative negligence rule which was adopted by the Employers Liability Act, and argues that the court cannot properly consider the propriety of a verdict of this size without at the same time considering the evidence to determine whether the jury made proper deductions or any deduction on account of claimant's contributory negligence. This, it is said, requires that the court review the evidence of contributory negligence.

We shall have occasion later in this opinion to consider the question of the claimed excessive amount of the verdict. But insofar as contributory negligence may have a bearing on its amount, it is our opinion that for the same reason that the question of negligence *vel non* on the part of the company was one to be decided by the jury, the question of whether plaintiff was guilty of contributory negligence was also one for the jury to decide.

Appellant specifies error in respect to the court's failure to give, in the language proposed by appellant, a considerable number of requested instructions. It is not claimed that the court's charge was not technically correct, as far as it went, but it is said that the instructions should have been amplified to the end that the jury be furnished standards and tests to guide it in

---

The company's roadmaster testified as follows: "Q. Let me ask you this: If the tie bar and the head block were so close together that they were two inches in one end, three inches in the middle and four inches at the other end, and if you had a seven-to-nine inch hole underneath that so that a man may get his leg caught and broken in there, wouldn't you say as a track man and roadmaster, wouldn't you consider that to be a dangerous condition? A. I would, sir." Appellant has an ingenious explanation for this answer, saying that the witness merely meant that it was dangerous because the ties would move. We think that since the question

referred to getting the leg caught the witness must have understood the question as referring to danger for a man crossing.

2. For a summary of the recent decisions of the Supreme Court dealing with this question see Appendix to opinion of Mr. Justice Douglas, concurring, in Wilkerson v. McCarthy, 336 U.S. 53, at page 71, 69 S.Ct. 413, 422. It is noteworthy that the Supreme Court has recently reversed a state supreme court upon this point by per curiam decision simply upon the authority of the cases here cited. Hill v. Atlantic Coast Line Railroad Co., 336 U.S. 911, 69 S.Ct. 507.

the determination of the issues submitted to it.[3]

The court's charge to the jury, although brief, covered the issues to be determined.[4] The main contention of appellant is that the instructions were too brief. Thus, although "negligence" was properly defined, it is complained that the court should have defined "contributory negligence" in a separate instruction, and in the language which the courts commonly use for that purpose.

■ Here it is well to bear in mind what was said in Continental Improvement Co. v. Stead, 95 U.S. 161, 165, 24 L.Ed. 403. "Perhaps some of the abstract propositions of the defendant's counsel contained in the instructions asked for, based on the facts assumed therein, if such facts were conceded, or found in a special verdict, would be technically correct. But a judge is not bound to charge upon assumed facts in the *ipsissima verba* of counsel, nor to give categorical answers to a juridical catechism based on such assumption. Such a course would often mislead the jury instead of enlightening them, and is calculated rather to involve the case in the meshes of technicality, than to promote the ends of law and justice. It belongs to the judicial office to exercise discretion as to the style and form in which to expound the law and comment upon the facts. If a judge states the law incorrectly, or refuses to state it at all, on a point material to the issue, the party aggrieved will be entitled to a new trial. But when he explains the whole law applicable to the case in hand, as we think was done in this case, he cannot be called upon to express it in the categorical form, based upon assumed facts, which counsel choose to present to him." Cf. Tyson-Long Co. v. Wolfe, 7 Cir., 81 F.2d 82, 84.

■ While some of these requested instructions might properly have been added

3. Some of the requested instructions were cautionary in character and designed to warn the jury against being misled in certain directions. Included in this group are instructions that the damages must not be more than reasonable; that the amount demanded in the complaint is no proof but is merely a claim; that the jury are not to fix damages by inquiring what sum they would take to exchange places with the plaintiff; that damages must be proved with reasonable certainty, and that the jury must not speculate or conjecture; that if plaintiff's loss of earning capacity is not total, due allowance for possible earnings must be made; that an award for loss of earning capacity must be limited to the present value or worth of the anticipated losses; that damages must not constitute a gift or windfall to plaintiff or be awarded as punishment or penalty to the defendant; that the jury must not be misled by the words "in whole or in part" in the Act, but that the plaintiff must prove that defendant's negligence, if any, was a proximate cause of his injury; that mere risk or hazard or danger is not itself negligence; that the defendant is not liable in absence of proof of negligence; that the defendant was not required to use the utmost care, but only ordinary care and ordinary skill; that defendant was not bound to provide and maintain the best and safest conditions, or to supply facilities, equipment or appliances which were not called for as a practical matter and in the exercise of ordinary care; that in determining whether plaintiff was guilty of contributory negligence, the jury must consider all the evidence, that produced by the plaintiff as well as that produced by the defendant.

4. The charge of the court correctly defined negligence and stated the effect of contributory negligence on the part of plaintiff if the jury should determine that such existed. The jury were told that they must exclude any sympathy as a basis for any verdict; that they must not have any prejudice against the defendant because it is a corporation or engaged in railroad business, or is an employer; that any award of damages must be reasonable. They were correctly instructed as to the provisions of the Federal Employers' Liability Act and of the necessity of proving that plaintiff's injuries were proximately caused or contributed to by the negligence of the employer. The jury were advised with great care as to the application of the rule of comparative negligence in the event that the jury should find contributory negligence, and the jury were told of the duty of the plaintiff to exercise reasonable care for his own safety. They were told that if the accident occurred solely and exclusively from the negligence of the plaintiff, their verdict must be for the defendant.

to the charge,[5] yet we find no prejudicial error in their omission. Others were properly refused for other reasons. Some were peremptory, and therefore, for reasons we have previously stated in commenting upon proof of negligence, they were properly rejected.

[5, 6] Other requested instructions not only added no essential feature to the charge given, but were subject to other valid objections.[6]

It is earnestly argued that the verdict is so grossly excessive as to require a conclusion that it was the result of passion and prejudice. It is contended that the trial court erred in refusing a new trial on this ground.

Guthrie's earnings for 1946, his last full year as an engineer, were $5,169.92. After his injuries, and before trial, wage increases actually made for men in his position would have increased his earnings by one-third, thus making them $6,893. Appellant argues that in any calculation of loss of earnings we must throw out the amounts to be paid in taxes, in other words, confine his loss to his reasonably to be expected "take-home" pay. Counsel for Guthrie challenge this, as they say the amount of taxes is purely speculative, and cite Stokes v. United States, 2 Cir., 144 F. 2d 82, which seems to support them. We think, however, that for the expected period of Guthrie's life, he would have found taxes fully as certain as his prospect of continued earnings.[7] In 1946 his net taxes

---

5. A comparison of the requested instructions with the court's charge would indicate that appellant's requested instruction No. 5, defining present worth of prospective loss of earning capacity, was more complete than the instruction of the court on the same subject, in reciting that the amount should be so computed that "at the end of the period for which allowance is made nothing would remain." Appellant has not argued that the charge was defective in this particular. Nor was this point specified in the objections to the instructions. It was then stated: "We respectfully object and except to the refusal of the court to give defendant's instruction No. 5, that the question is not loss of wages, but also loss of earning capacity, and only that could be used." See Federal Rules of Civil Procedure, Rule 51, 28 U.S.C.A. Cf. Hall v. Aetna Life Ins. Co., 8 Cir., 85 F.2d 447, 450.

6. Thus the request No. 29, to the effect that because of the construction of the locomotive in such manner that Guthrie was out of the view of the operators of the locomotive until he was run over, "you cannot find that the operators of the locomotive were negligent because they did not see Guthrie until after he was run over, if that is the fact", suggests what was said in Union Pacific R.R. Co. v. Hadley, 246 U.S. 330, 332, 38 S.Ct. 318, 319, 62 L.Ed. 751, as follows: "On the question of its negligence the defendant undertook to split up the charge into items mentioned in the declaration as constituent elements and to ask a ruling as to each. But the whole may be greater than the sum of its parts, and the Court was justified in leaving the general ques-

tion to the jury if it thought that the defendant should not be allowed to take the bundle apart and break the sticks separately, and if the defendant's conduct viewed as a whole warranted a finding of neglect."

Appellant asked for an instruction No. 36, as follows: "If plaintiff Guthrie was experienced in, and familiar with, the work he was doing and knew and appreciated normal risks and hazards which attend it, including chance of injury from getting his foot caught in a switch in front of an approaching train, defendant Southern Pacific was not required to take steps to protect him against such of those risks and hazards as did not result from its negligence, which were normal and customary risks and hazards of the employment, which were known to, and appreciated by, him and which he himself could have avoided by exercising reasonable care for his own safety." We think that since the decision in Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967, a court would do well to avoid the giving of such an instruction which squints in the direction of assumption of risk.

7. Of course, if Guthrie is awarded a sum as the present worth of his loss of earning capacity, it must be assumed that the income from investments acquired with that sum would be taxable. If estimated tax is properly deducted at one end, it should be added at the other. Since present worth is computed upon the hypothesis of a gradually diminishing principal, the interest or income factor in the amounts consumed each year would not be large,

were $524.90. We think that the record will not establish a possible loss of earnings in excess of $6,000 per year after taxes.

Whether that possible loss is reasonably probable must depend upon whether Guthrie's disability is total. There is also controversy as to whether loss of earnings can be said to relate to a period after Guthrie would have reached age 70, when the rules of his employer would require his retirement. We think the prospect of a continuance of employment after 70, and after compulsory retirement from employment by the Southern Pacific, too remote to enter calculations here. And for similar reasons we think the jury would be warranted in believing that the prospect of a man past 59, with but one leg, getting a job in the labor market in competition with younger and able-bodied men, was equally remote.

Computed at 3 per cent[8] the present worth of $6,000 a year for eleven years is $55,515.74.[9] This figure is somewhat less than that arrived at by the trial judge, whose opinion stated that the amount would be "between $60,000, and $70,000." Such a figure would be produced if the total earnings of $6,893 were considered, without deduction for taxes.[10] It is apparent that an appraisal of the verdict shows that assuming that the jury correctly appraised the present worth of the loss of earnings, there must have been some $45,000 awarded on account of such items of damage as pain and suffering, inconvenience and disfigurement.

The evidence as to these factors was that Guthrie was hospitalized for 37 days during which he underwent two operations on his stump. In the process of healing a 27 degree contracture of the right thigh developed, so that the stump of his leg extended at an angle which up to the time of trial had prevented him from wearing an artificial limb, and it appeared possible that he would never be able to wear one. He suffered from phantom pain in the cut limb, there was tenderness over the cut end of the sciatic nerve, and the medical testimony was that this phantom pain, a continued constant burning sensation as if he felt his amputated foot, was characteristic of amputees generally, and was real pain, often remaining constant and permanent. Loss of the leg has increased his discomfort in his back, due to a congenital anomaly which previously existed there.

■ It is common knowledge that for a man of Guthrie's age, aches and pains arising out of physical disabilities do not ordinarily lessen, as they might for a younger man. We do not think it necessary to determine whether the probability of future suffering was proven with the requisite degree of certainty. On the whole the inconvenience, the disfigurement, and certainly some degree of distress, are shown to be both substantial and permanent. "Insofar as the award of damages to him consists of compensation for pain and suffering it is, obviously, nothing that an appellate court can, or a trial court for that matter, measure by a yardstick as to whether the jury has given too much or too little."[11] The same is true with respect to the elements of inconvenience and disfigurement. And in comparing the amount here awarded with amounts previously held by the courts to be excessive, we are bound to consider "the century's continued depreciation of the purchasing value of the dollar, with the extraordinary acceleration of the rate of decrease of the past decade."[12]

■ Nevertheless, it is the opinion of the members of this court that the amount of the verdict is too high. What we, as an

---

and would not greatly, if at all, exceed his exemptions.

8. In 1948 the twelve largest life insurance companies in the United States made a return upon their invested funds which on the average (not weighted) was slightly less than 3 per cent. (Best's Life Insurance Reports, 1949 Ed., Alfred M. Best Co. Inc. N.Y.)

9. 9.252624 times the annual sum. Bailey's Tables and Methods, (Times-Mirror Press, Los Angeles).

10. The figure would be $63,778.33.

11. Scott v. Baltimore & O. R. Co., 3 Cir., 151 F.2d 61, 64.

12. Southern Pacific Co. v. Zehnle, 9 Cir., 163 F.2d 453, 454. See also, "Fluctuating Dollars and Tort Damage Verdicts", 48 Columbia Law Review, p. 264, footnote 1.

appellate court, are permitted to do about such a situation, is another matter.

■ It appears to be generally agreed that when it can be said that the verdict of the jury was the result of passion or prejudice, it is the duty of the appellate court to set aside the verdict and grant a new trial. Southern Pac. Co. v. Zehnle, 9 Cir., 163 F. 2d 453; L. E. Whitham Const. Co. v. Remer, 10 Cir., 105 F.2d 371; American Ice Co. v. Moorehead, 62 App.D.C. 266, 66 F.2d 792. In such a case a new trial must be ordered,—the error cannot be cured by a remittitur. Minneapolis, St. P. & S. S. M. Ry. Co., v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243. Some authorities hold that passion and prejudice may not be inferred from the mere excessiveness of the verdict, proof of appeals to passion and prejudice not appearing in the record. Larsen v. Chicago & N. W. R. Co., 7 Cir., 171 F.2d 841, 845.[13] As to this, we need not express any opinion for the reason that in our view there is nothing in this case, either in the size of the verdict or otherwise, sufficient to establish the existence of passion or prejudice.

There is an abundance of authority in the decisions of the federal courts that in this situation an appellate court has no power to do anything about such a verdict. The view most commonly expressed is that stated by Judge Goodrich, for the Court of Appeals of the Third Circuit, in Scott v. Baltimore & O. R. Co., supra, as follows: "The members of the Court think the verdict is too high. But they also feel very clear that there is nothing the Court can do about it. * * *" "A long list of cases in the federal courts demonstrates clearly that the federal appellate courts, including the Supreme Court, will not review a judgment for excessiveness of damages even in cases where the amount of damage is capable of much more precise ascertainment than it is in a personal injury case."

The cases in accord, cited in the margin of that court's opinion, could be multiplied.[14]

Most of the cases so holding cite Southern Ry. Carolina Division v. Bennett, 233 U.S. 80, at page 87, 34 S.Ct. 566, at page 567, 58 L.Ed. 860, in which it was said: "It may be admitted that if it were true that the excess appeared as matter of law, —that if, for instance, the statute fixed a maximum and the verdict exceeded it,—a question might arise for this court. But a case of mere excess upon the evidence is a matter to be dealt with by the trial court. It does not present a question for re-examination here upon a writ of error." On the other hand, in Cobb v. Lepisto, 9 Cir., 6 F. 2d 128, this court remanded a case with directions to order a new trial unless an excess amount, stated by this court, were remitted. In Department of Water & Power of City of Los Angeles v. Anderson, 9 Cir., 95 F.2d 577, while finding the verdict there in question not to be "grossly excessive", this court stated the rule of Cobb v. Lepisto to be as follows, 95 F.2d at page 586: "Although it was held in Southern Ry. Co. v. Montgomery, 5 Cir., 46 F.2d 990, 991, that a Circuit Court of Appeals has 'no jurisdiction to correct a verdict because it is excessive,' the rule in this court is that the refusal to grant a new trial is 'such an abuse of discretion as is reviewable by this court' where the verdict is 'grossly excessive.' ". In Virginian Ry. Co. v. Armentrout, 166 F.2d 400, the Court of Appeals for the Fourth Circuit, reversed the judgment and ordered a new trial in a personal injury case because of its determination that the verdict was excessive notwithstanding the trial judge had denied a motion for new trial made upon this ground. The court cited Cobb v. Lepisto, supra, with approval and said: "To the federal trial judge, the law gives ample power to see that justice is done in causes pending

13. Cf. Kurn v. Stanfield, 8 Cir., 111 F.2d 469. See "Correction of Damage Verdicts by Remittitur and Additur", 44 Yale Law Journal 318; cases cited in note 18, p. 321.

14. Some of these cases, more recent than Scott v. Baltimore & O. R. Co., supra, are Feltman v. Sammond, 82 U.S.App.D.C. 404, 166 F.2d 213, Reid v. Nelson, 5 Cir., 154 F.2d 724, Chicago & N. W. Ry. Co. v. Green, 8 Cir., 164 F.2d 55, Herzig v. Swift & Co., 2 Cir., 154 F.2d 64.

before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require. * * *

"The power of this court to reverse the trial court for failure to exercise the power, where such failure, as here, amounts to an abuse of discretion, is likewise clear. * * * "15 [166 F.2d 408].

The writer of this opinion thinks that this court should remand this case with directions to grant a new trial unless the appellee shall file his consent in writing to remit from the judgment now entered the sum of $20,000 together with all interest, if any, which may have accrued upon the amount so remitted. Neither the industry of counsel nor our own research has been able to turn up any case of any appellate court where a verdict anywhere near so high as that rendered here has been upheld as compensation for comparable injuries. Cobb v. Lepisto, supra, as well as Estabrook v. Butte Anaconda & Pacific Ry. Co., 9 Cir., 163 F.2d 781, in which a new trial

was ordered because of inadequate damages, had fixed the rule of this circuit as one sustaining the power of a federal appellate court to review the trial court's action in a case of this kind. He thinks this power should be exercised here independently of the fact that the defect in the charge mentioned in note 5, supra, probably accounts for the excessive verdict; that this defect furnishes a special additional reason for holding the court's refusal to set aside the verdict an abuse of discretion and that the defective instruction may be taken into consideration in this connection notwithstanding appellant's failure to make specific objection to the charge on this ground. He is of the opinion that a disclaimer of appellate power such as that stated in Scott v. Baltimore & O. R. Co., supra, is a manifestation of a momentum generated in the earlier cases, and not yet arrested simply because the courts expressing this doctrine have failed to note that the procedural obstacles which originally prevented appellate review no longer exist, as was stated in the Fairmount Glass Works case, supra, note 15.[16] In his opinion the doctrine of impotence expressed in the cases mentioned is due for a general

---

15. Cobb v. Lepisto, supra, prior to the decision in Virginian Ry. Co. v. Armentrout, supra, has been stated to stand alone. See Miller v. Maryland Casualty Co., 2 Cir., 40 F.2d 463. Cf. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, footnote 14, page 485, 53 S.Ct. 252, 255, 77 L.Ed. 439. It dealt with a verdict in an action to recover the value of services rendered, something more readily calculated than the compensation for pain, suffering, and the like.

Southern Railway Co. v. Bennett, supra, and the earlier cases asserting want of power to review the action of the trial court in denying a new trial on the ground of excessiveness of the verdict, were explained by Judge Learned Hand in Miller v. Maryland Casualty Co., 2 Cir., 40 F.2d 463. The rule is there said to be based upon a procedural difficulty in that historically the writ of error did not afford review of the trial court's action upon a motion for a new trial, and it was said that the appeal later provided for was subject to the same limitations. Subsequently in Fairmount Glass Works v. Coal Co., 287 U.S. 474, 482, 53 S.Ct. 252, 254, 77 L.Ed. 439, the Supreme Court ex-

pressly referred to the decision in Miller v. Maryland, supra, saying: "It has been suggested that a review must be denied because of the historical limitation of the writ of error to matters within the record, of which the motion for a new trial was not a part. Compare Judge Learned Hand in Miller v. Maryland Casualty Co. [2 Cir.], 40 F.2d 463. But the denial of review can no longer rest upon this ground, since the record before the appellate court has been enlarged to include in the bill of exceptions a motion for a new trial, made either before or after judgment."

16. Rule 75 of the Federal Rules of Civil Procedure relating to the record on appeal, is even more inclusive than the bill of exceptions referred to in the Fairmount Glass Works case. In the field of criminal appeals the Supreme Court in Griffin v. United States, 336 U.S. 704, 69 S.Ct. 814, noted no procedural difficulty in reviewing the trial court's action upon a motion for a new trial notwithstanding the earlier disclaimers of authority in cases such as Blitz v. U. S., 153 U.S. 308, 14 S.Ct. 924, 38 L.Ed. 725. Cf. National Bank of Commerce v. U. S., 9 Cir., 224 F.

overhauling and he thinks that the decision of Judge Parker in Virginian Railway Co. v. Armentrout, supra, points to the reasons why this court should not abdicate the power which it has previously asserted in Cobb v. Lepisto, supra, and Department of Water & Power v. Anderson, supra.[17]

The majority of the court, however, do not agree with what has been stated in the preceding paragraph. They find it unnecessary to express any opinion here as to whether, in a case of this kind, this court may not, under any circumstances, review the action of the trial court upon an application for a new trial because of the alleged excessiveness of the verdict. The court cannot say that the verdict here is so large that the refusal of the trial court to grant a new trial, or to condition a denial of a new trial on a remittitur, can be called an abuse of discretion. The majority of the court think the amount of this verdict left it within the area of the trial court's discretion.

Finally, error is assigned because Guthrie was permitted to testify that on another railroad, the Texas and Pacific, employees are permitted to work beyond age 70. It is sufficient to say that we think the admission of that evidence could not have been prejudicial. Katalla Co. v. Rones, 9 Cir., 186 F. 30, 35.

The judgment is affirmed.

679, 683. The rational explanation is to be found in Rule 39(b), Federal Rules Criminal Procedure, 18 U.S.C.A. incorporating the rules and practice governing civil appeals.

17. Cf. Pacific Greyhound Lines v. Rumeh, 9 Cir., 1949, 178 F.2d 652, in which this court considered at length the question whether the verdicts there were excessive.