**L. J. RUNNELS, Plaintiff,**

v.

**THE CITY OF DOUGLAS, ALASKA, a Municipal Corporation, and A. J. Balog, Defendants.**

No. A–6824.

District Court, Alaska, First Division, Juneau.

Sept. 24, 1954.

Judgment Amended Oct. 16, 1954.

See 124 F.Supp. 657.

George Toulouse, William L. Paul, Jr., Juneau, Alaska, for plaintiff.

Faulkner, Banfield & Boochever, Juneau, Alaska, for defendants.

FOLTA, District Judge.

This is an action by the employer, as subrogee under the provisions of the Longshoremen's and Harbor Workers' Act, §§ 1 et seq., 33, 33 U.S.C.A. §§ 901 et seq., 933, for damages for personal injuries sustained by Ashley, an employee, allegedly as a result of the negligence of the defendants.

It appears that Ashley was one of four employees of the plaintiff who were engaged in painting a two-lane steel bridge of the cantilever type. One lane was closed to traffic and used for their equipment, paint, etc. From the commencement of the job to the time of the accident, a scaffold was suspended from each side of the bridge above the deck and parallel with it. Boards were placed from one scaffold to the other so as to permit the men to walk back and forth and paint the transverse beams. Two hoses were connected to the spray gun with which

the painting was done. One of them conveyed paint from its container and the other air under pressure from the compressor which, as in the case of the container, was kept on the deck of the bridge. These hoses were lashed together apparently for ease of handling. The combined weight of the gun and hoses was considerable. To relieve the operator of the strain of holding the gun in a painting position, the hoses were separated at a distance of four or five feet from the gun sufficiently to permit the operator to put one hose over his head and upon a shoulder and the other under the opposite armpit. Even then the strain was such as to require the rotation of employees in operating the spray gun. In the prosecution of the work, two of the employees were required to be on the staging already described and two on the deck of the bridge. The duties of the latter included serving the men on the staging and warning and directing traffic. Barricades were erected at each end of the closed lane, but the testimony is in conflict as to whether warning signs were continuously maintained. The line of hoses was made fast at a point approximately above the middle of the staging, with sufficient slack to allow the operator to walk the width of the bridge. Although this relieved the operator of the weight of hoses behind him, it necessarily resulted in a loop in the line, the size of which would vary in inverse ratio to the distance thereof from the place at which it was fastened. This loop was allowed to hang below the board on which the operator walked in order to avoid entanglement with his feet. At the time of the accident, the staging was approximately 11 feet above the deck of the bridge. On July 6, 1951, at about 5:45 p. m., when the defendant Balog, an employee of the defendant City of Douglas, entered the bridge with a dump truck, Ashley was operating the gun approximately in the middle of the staging with his back turned toward the truck and with the loop described dangling below the staging.

It is undisputed that the staging and the men on it, as well as the loop itself, were clearly visible to anyone driving a car upon the bridge. Indeed one of the passengers in the truck saw the loop as it struck the cab top. The deck employees testified that they shouted and signaled to Balog to stop and that one of them stood directly in his path, but that he apparently did not hear them because of the noise of his truck and did not see them because he was engaged in conversation with two passengers whom he had picked up on the approach to the bridge. The deck employees testified that thereupon they shouted a warning to Ashley. The forward end of the dumpbody of the truck had a shield extending up and over the rear of the cab to protect the rear window of the cab from damage. It appears that this projection caught the loop referred to. Ashley testified that when he saw that he did not have time to lift the hose from his shoulder because of the speed of the truck, he grabbed a rope. The testimony is in sharp conflict as to the speed of the truck. Plaintiffs' witnesses testified that it was proceeding at about 25–30 miles per hour, whereas the witnesses for the defendants testified that the truck was moving at a speed of 8–10 miles per hour. The pull on the hose was so great that it broke Ashley's left collar bone, paralyzing his left arm and making it impossible for him to hang on. He was jerked off the staging and flung with great force to the deck of the bridge and the 200 pound container of paint was dragged for approximately 20 feet before the hose was broken off and carried away with the truck to Balog's destination, a distance of about two miles, where, upon stopping, he discovered the spray gun wedged in the rear end of the truck with about 30 feet of hose trailing behind.

I find that the method of handling the hoses was reasonably safe; that the staging and the loop dangling therefrom were clearly visible to anyone driving upon the bridge at the time of the

accident; that Balog knew and had known for a month or so that the bridge was being painted; that there were men working overhead and on the deck of the bridge; that he could have seen and heard the men on the deck of the bridge shout and signal to him before the loop became entangled with the truck; that he was proceeding at too great a speed under the circumstances; and hence conclude that he was negligent and that such negligence was the proximate cause of the accident.

I further find that Ashley sustained a fracture of the vertebra, with paralysis of the hip and legs for approximately 30 days, a fracture of the left clavicle and of the left scapula, as well as of one or two ribs, and severe bruises and lacerations, necessitating one or more operations, the use of a body cast and a back brace; that he is now suffering from spastic paraplegia and hyperesthesia and that his eliminative functions have been affected; that at the time of the accident he was 32 years of age and had a life expectancy of 32 years. I also find that

at the time of the trial, the plaintiff had paid, under the provisions of the Longshoremen's and Harbor Workers' Act, compensation to Ashley in the sum of $5,845, $1,190 for hospital and medical expenses, and $90 for a brace; that Ashley's average annual earning capacity before the accident was $5,600, that his earning capacity has been permanently impaired, and that he is now capable of earning approximately $3,500 a year.

From the foregoing, I conclude that the plaintiff is entitled to recover, in addition to the sums mentioned, $13,880 for loss of wages to January 1, 1954, and $2,300 for loss of wages during 1954; that in the remaining 28 years Ashley will lose $58,800 in wages, the present worth of which, computed at the rate of return held proper in Southern Pacific Co. v. Guthrie, 9 Cir., 180 F.2d 295, is $30,942. I also find that the plaintiff is entitled to recover, for the pain and suffering endured by Ashley, the sum of $5,000.

Judgment may be submitted in accordance herewith.